IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SHERI GOLTER, | ) | 4:06CV3287 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| SQUARE D COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

Sheri Golter worked for Square D Company ("Square D") and has admitted the accuracy of a document summarizing twenty-three disciplinary actions in her personnel file accumulated during a nine-year period at Square D. Those disciplinary matters include four reprimands, one three-day suspension, and at least two referrals to the employee assistance program. After violating a "last chance agreement," Golter was terminated from employment. Golter claims her termination was the result of a Square D plan to implement a two-tier wage structure which had an adverse impact on workers forty years of age and older, and that it was also the result of gender or sex discrimination. Square D has made and properly supported a motion for summary judgment. I will grant the motion.

## I. BACKGROUND

### Objections to Plaintiff's Brief and Evidence

I first address Defendant's objections to Plaintiff's response to the motion for summary judgment, as asserted in its reply brief. (Filing 31, Def.'s Reply Br.) First, Defendant asserts that Plaintiff's brief does not clearly address each of the moving party's numbered statements of fact and that as a consequence, all facts listed in its statements of fact should be deemed admitted. (Filing 31, Def.'s Reply Br. at ¶ 1 (citing the portion of NECivR 56.1(b)(1) requiring the non-moving party to include

a concise response to the moving party's statement of facts, addressing each numbered statement in the movant's statement and supporting any disagreement with pinpoint citation to the record).) I find that Plaintiff's response sufficiently addresses Defendant's numbered statement of facts. Plaintiff's brief does list those statements in Defendant's statement of facts with which Plaintiff agrees. (Filing 26, Pl.'s Br. in Opp'n to Mot. for Summ. J. at 2.) Plaintiff does attempt, though largely unsuccessfully and not very concisely, to controvert the remainder of Defendant's Statement of Facts and includes citations to the record. However, since my review of Plaintiff's brief and evidence indicates that Plaintiff has failed to identify any material issue of fact, I reach the result sought by Defendant: I find all properly supported facts in its statement of facts to be undisputed. NECivR 56.1(b)(1) ("properly referenced facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response").

Defendant also asserts that none of Plaintiff's evidence is admissible because it lacks an authenticating exhibit. (Filing 31 at ¶ 2.) I disagree. Plaintiff submitted both affidavits and documents. The *affidavits* are self-authenticating because they are signed and notarized. Fed. R. Evid. 902(8) (notarized documents are self-authenticating).[1] However, only three of the twenty-four *documents* are properly authenticated. Three documents are referenced in Sue Larsen's affidavit: Plaintiff's Exhibit 2 (filing 27-4), listed as "Just Cause Seven Point Test; Plaintiff's Exhibit 3 (filing 27-5), an extract of the 2005 union contract describing a two-tier wage scale; and Plaintiff's Exhibit 4 (filing 27-6), an extract of the union contract in effect in

_____

[1]The better practice is for the attorney submitting an index of evidence to submit an affidavit indicating that affidavits within that index are true and correct copies. NECivR 7.1(b)(2) provides that when a nonmoving party submits evidence in opposition to a motion, that evidence shall be filed separately with an index of evidence, and "[a]ny documents filed with the index must be identified and authenticated by affidavit." (*See, e.g.,* Filing 19-2, Ex. 15 (affidavit of Defendant's counsel) at CM/ECF pages 31-33.)

-2-

2002 and at the time of some of the several personnel memos in Golter's personnel file.  For purposes of this motion, I find each to be properly authenticated by Larsen's affidavit.  The remainder of the documents in Plaintiff's Index of Evidence are inadmissible.

Plaintiff's Exhibits 8-26 purport to be copies of some of the documents in Golter's personnel file documenting disciplinary matters.  The only attempt to authenticate those exhibits is Plaintiff's affidavit, in which she states that "true and correct copies" of those documents are attached, "[s]aid documents were provided to me by Defendant," and "it is my assumption that they were kept by Defendant during the normal course of its business activity."  (Filing 27-9, Ex. 7 (Golter Aff.) at ¶ 9.)  Authentication means more than "my opponent gave me a document."  *Cordray v. 135-80 Travel Plaza, Inc.*, 356 F. Supp. 2d 1011, 1016 n.5 (D. Neb. 2005).  An employee's assumption that documents were kept in the ordinary course of business is insufficient to establish foundation for the admission of those documents as business records, particularly when that employee does not assert familiarity with the record-keeping procedures of the organization.  Fed. R. Evid. 803(6) (business records authenticated by the testimony of "the custodian [of the records] or other qualified witness" are an exception to the hearsay rule); *Dyno Const. Co. v. McWane, Inc.*, 198 F.3d 567, 576 (6th Cir. 1999) (person laying foundation for introduction of business record is required to be "familiar with the record-keeping procedures of the organization").  Plaintiff's Exhibits 8-26 are not properly authenticated and thus inadmissible.  Fed. R. Civ. P. 56(e) (on motion for summary judgment, nonmoving party must controvert moving party's assertions of fact by setting forth "such facts as would be admissible in evidence"); NECivR 7.1(b)(2) (documents may be authenticated by an affidavit made on personal knowledge which sets forth facts admissible in evidence and shows that the affiant is competent to testify to the matters stated therein).

Plaintiff's Exhibits 27 and 28 purport to be summaries of two meetings at which Square D managers discussed Golter. (Filing 27-16 at CM/ECF pages 2-5.) Again, the only attempt to authenticate those exhibits is Plaintiff's affidavit, in which she states that "attached are the minutes of certain meetings provided to me by Defendant" and "I assume that these documents were kept in the normal course of Defendant's business." (Filing 27-9, Ex. 7 (Golter Aff.) at ¶ 23.) Plaintiff's Exhibits 27 and 28 are not properly authenticated and are inadmissible.

In summary, I find that Plaintiff's Exhibits 1, 5, 6, and 7 (the affidavits) are self-authenticating. I find that Exhibits 2, 3, and 4 (the just cause seven point test, the extract of the 2005 union contract which refers to the two-tier wage plan, and the grievance provisions from the union contracts in effect at the time of several of the personnel memos in Golter's personnel file) are authenticated. Exhibits 8 - 28 (all documents) are unauthenticated and thus inadmissible. Whether the authenticated documents contain *admissible* evidence is a different question, addressed later in this opinion. I turn now to statement of the undisputed facts.

## *Facts Which Plaintiff Admits To Be Undisputed*

Plaintiff specifically acknowledges that the following facts are undisputed. (Filing 26, Pl.'s Br. in Opp'n to Mot. for Summ. J., at 2.)

1.      Square D is a corporation engaged in the manufacturing of electrical distribution and transmission equipment, and operates a facility in Lincoln, Nebraska. (Filing 19, Ex. 1 (Golter Dep.) at 11:3-24.)[2]

---

[2]Golter's deposition bears three sets of page numbers:  the page number of the deposition, the CM/ECF page number, and a handwritten number.  All citations in this opinion to Golter's deposition are to the page number of the deposition.  Extracts from her deposition appear both in filing 19 and filing 32, so citations to Golter's deposition include reference to the filing number.

2.      The Lincoln facility employs approximately 300 employees, most of whom are represented by the International Brotherhood of Electrical Workers Union. (Filing 19-2, Ex. 6.)

3.      At all pertinent times in this case, the Company and the Union were parties to a Collective Bargaining Agreement.  (Filing 19-2, Ex. 6.)

4.      The union contract gives Square D the authority to discharge, suspend and/or discipline employees for just cause.  (Filing 19-2, Ex. 6.)

5.      Square D maintains a Harassment Free Environment Policy, which prohibits Square D employees from engaging in harassment and other inappropriate conduct.  The policy expressly states that "any employee who engages in conduct prohibited by this policy can expect disciplinary action up to, and including, immediate termination, depending upon the circumstances."  (Filing 19-2, Ex. 9.)

6.      Plaintiff, Sheri Golter, was hired as a Process Operator on April 25, 1977.  (Filing 19, Ex. 1 (Golter Dep.) at 7:2-6.)

7.      Golter's hourly rate of pay at the time of her termination was $16.08 per hour, including gain sharing of 18% of her hourly rate, a cost-of-living adjustment of ten cents per hour, and a shift premium of seventy-two cents per hour.  (Filing 19, Ex. 1 (Golter Dep.) at 16:20-24.)

8.      Golter was employed on a full-time basis and worked at least 40 hours per week.  At the time of her termination, her supervisor was Jerome Topil (male, 59).  (Filing 19, Ex. 1 (Golter Dep.) at 17:2-4, 21:3-8.)

9.      Golter admitted that no one ever made any negative comments to her about her gender.  (Filing 19, Ex. 1 (Golter Dep.) at 103:18-25.)

10.     Golter admitted that no one ever made any age-related comments to her in the workplace.  (Filing 19, Ex. 1 (Golter Dep.) at 97:2-17.)

11.     Golter stated she had a personality conflict with a group of females at work.  (Filing 19, Ex. 1 (Golter Dep.) at 30:10-23.)[3]

*Other Undisputed Facts[4]*

12.     Defendant's counsel prepared a two-page document captioned "Golter Disciplinary History" which was "a summary of the documents [Defendant's counsel had] given to [Plaintiff's] attorney from [Plaintiff's] disciplinary file."  (Filing 32, Ex. 16 (Golter Dep.) at 84:20-22.)  In her deposition, *and after conferring with counsel off the record,* Golter admitted that this document was "an accurate reflection of the discipline [she] received at Square D in the last nine years of [her] employment." (Filing 32, Ex. 16 (Golter Dep.) at 87:5-20.)  This document, subsequently referred to as Golter's "Disciplinary History," is located in the record as Def.'s Ex. 3 at Filing 19-2 and CM/ECF pages 2-3.  (Filing 32, Ex. 17 (Zalewski Aff.) at ¶ 2 .)

13.     Golter's Disciplinary History lists the following disciplinary actions:

---

[3]This citation is that set forth in Defendant's statement of facts.  (Filing 18 at page 6 and ¶25.)  Page 30 of Golter's deposition is not included in either exhibit containing extracts from Golter's deposition.  I include this fact because Plaintiff specifically agreed that this statement of fact was undisputed.  (Filing 26, Pl.'s Br. in to Mot. for Summ. J. at 2.)

[4]These are largely, but not exclusively, the facts submitted by Defendant.  I have omitted some of the facts submitted by Defendant, finding them not supported by the record.  I have expanded upon Defendant's statement of facts as appropriate and as supported by the record.

| | |
|---|---|
| 4-3-96 | reprimand for employee conflicts |
| 7-4-96 | personnel memo not to tell others what to do |
| 2-4-97 | personnel memo re: job assignments |
| 12-5-97 | personnel memo re: work assignments |
| 12-12-97 | personnel memo on failure to do job assignment |
| 2-9-98 | reprimand re: not following work duties |
| 11-7-98 | personnel memo re: overtime assignments |
| 11-7-98 | personnel memo re: interference with other employee's work |
| 11-7-98 | personnel memo to stay on work assignments |
| 6-11-99 | personnel memo re: being disruptive in workplace |
| 6-11-99 | personnel memo to wear required protection and do stretches |
| 6-25-99 | personnel memo re: workplace harassment |
| 6-30-99 | reprimand for creating hostile work environment |
| 12-6-99 | personnel memo re: engaging other employees in personal issues |
| 12-16-99 | final reprimand for inappropriate conduct |
| 3-20-00 | personnel memo re: employee work assignments |
| 5-11-01 | caution note to let supervisors handle job-related issues |
| 7-27-01 | personnel memo re: work assignments |
| 10-11-01 | personnel memo re: work assignments |
| 11-9-01 | meeting to try to help resolve employee work assignment issues and referral to Insight EAP |
| 6-19-03 | acknowledgment of workplace violence policy |
| 6-25-03 | 3-day suspension[5] for confrontations with coworkers |

---

[5]The Disciplinary History states that this was a four day suspension. Golter stated during her deposition that the suspension was only for three days, and Defendant's counsel agreed with her explanation. (Filing 32, Ex. 16 (Golter Dep.) at 85:3-11.)

3-15-04     "Last Chance" agreement for employee confrontations[6]

9-22-04     termination

(Filing 19-2, Ex. 3 and CM/ECF pages 2-3.)

14.     Golter was suspended on June 24, 2003 for three days after creating a hostile work environment for her co-workers.  A union steward accompanied Golter when she received notice of the suspension, and Golter unsuccessfully grieved this suspension.  (Filing 19-2, Ex. 12 (Suspension Notice) at CM/ECF page 27, filing 19, Ex. 1 (Golter Dep.) at 44:1-45:11.)

15.     The June 24, 2003 Suspension Notice stated, in pertinent part, as follows:

> This Suspension Notice is the result of your unacceptable actions specifically creating a hostile and [disruptive][7] work environment. Examples of such behaviors include inappropriately addressing/persisting on issues with co-workers and supervisors; and your involvement and interference in matters not pertaining to you, inappropriate behavior toward co-workers including violation of the work place violence policy.
>
> You have been counseled and reprimanded in the past on the following:
> •     Confrontation with co-workers and contributing to a hostile and unproductive work environment.
> •     Inappropriate involvement and interference in matters not pertaining to you which impacts your productivity and that of others.

_____

[6]This agreement is separately included in the record as Filing 19-2, Ex. 2 at CM/ECF page 1.

[7]The notice contained the word "distributive," and counsel for Plaintiff agreed that this word should have been "disruptive."  (Filing 19, Ex. 1 (Golter Dep.) at 44:6-12.)

-8-

> - Persisting on issues which further impacts morale and productivity.
> - Workplace Violence Policy
>
> . . .
>
> You have been provided with and understand the Workplace Violence Policy.
>
> Additionally, as a condition of your employment you will be required to schedule an appointment and complete any recommended counseling with Insight.
>
> Any future actions of a similar nature will result in termination of your employment.

(Filing 19-2, Ex. 12 (Suspension Notice) at CM/ECF page 27; Ex. 11 (Workplace Violence Policy) at CM/ECF page 26.)

16.    On March 7, 2004, Bonnie Rice complained to a foreman about Golter, and then made a harassment complaint to the Square D Human Relations office, indicating that Golter had attempted to interfere with Rice's work assignment. (Filing 19, Ex. 1 (Golter Dep.) at 45:22-48:17.)

17.    Golter was given a Last Chance Agreement on March 15, 2004. Union representative Shelley Bartek witnessed Golter's signature on the agreement.   The Last Chance Agreement provided as follows:

LAST CHANCE AGREEMENT

> This last chance agreement is a result of your continued unacceptable actions including inappropriately addressing/persisting on issues with co-workers and supervisors; and your involvement in matters not pertaining to you.  In consideration of Square D Company's willingness to continue to employ me, I, Sheri Golter, agree:

1.     Not to discuss issues with other employees which do not pertain to them.

2.     To not persist on issues with co-workers, Supervisor, Management, and staff members.  Once an issue has been discussed it should not be mentioned again to any co-worker or management staff.  Your supervisor or manager will notify you when an issue is resolved.

3.     Not to get involved in matters that do not pertain to me. *Including but not limited to what machines co-workers are running or what they are doing.*  Your supervisor will instruct you on your assignments for the day.

4.     Not to berate, yell, or use obscene language when talking with anyone while on Square D premises.

5.     To work at the assignments given to me by my supervisor and not address what others are working on.  I agree that I will not discuss what my co-workers['] assignments are or how they are doing their assigned work.  Your supervisor will notify you of your assignments for the day.

6.     I agree I will not instruct others on their assigned job tasks.

7.     I agree to contact Insight [an employee assistance plan service provider] and complete any program they feel is appropriate.

I UNDERSTAND AND AGREE THAT I MAY BE TERMINATED FROM MY JOB WITHOUT RECOURSE IF DURING THE NEXT YEAR AND ONE HALF (1 ½) I VIOLATE OR REVOKE ANY PARAGRAPH OF THIS LAST CHANCE AGREEMENT.

I understand that this LAST CHANCE AGREEMENT is not a guarantee of employment and that I may be terminated for lack of work, attendance or performance problems, misconduct, rule violations or reasons, notwithstanding my compliance with this agreement.

I have read and understand this LAST CHANCE AGREEMENT and certify that I am entering into it freely and voluntarily after a reasonable opportunity for deliberation and consultation with my union representative.  I also certify that I am legally competent to enter into this agreement.

-10-

(Filing 19-2, Ex. 2 at CM/ECF page 1 (italics added).)

18.     Golter was cited for a work rule violation after the Last Chance Agreement was issued and before September 21, 2004, but was not then terminated. (Filing 19, Ex. 1 (Golter Dep.) at 54:4-23.)

19.     On September 21, 2004, Golter got into an argument with Dave Cooper, Fabrications Set-up Operator at Square D's Lincoln facility.  (Filing 19, Ex. 1 (Golter Dep.) at 62:1-25.)

20.     When Cooper was using a hand truck and loading parts back into a box that had tipped over, Golter came and took the hand truck away from Cooper while he was kneeling between or immediately in front of the forks of the truck.  (Filing 19, Ex. 1 (Golter Dep.) at 62:1-25, 83:4-25; Filing 27-7, Ex. 5 (Borgmann Aff.) at ¶¶ 7, 12 .)

21.     Golter left her machine running unattended while she went to take the hand truck from Cooper, resulting in some parts from her machine spilling out on the floor.  (Filing 19, Ex. 1 (Golter Dep.) at 74:9-15; Filing 19-2, Ex. 4 (Osmera Aff.) at ¶ 6.)

22.     Golter admitted to this conduct in her letter to the NEOC, which reads, in part, as follows:

> When I was finished filling the pallet of cleaned parts I went to pull the pallet out and the yellow truck was gone.  I went around the corner and saw it parked with the handles facing me.  As I took hold of the handles I moved the truck about two inches[.]  I saw Dave crouched down in front of the truck picking up a box of parts that he had ran into with the truck.  The truck was obstructing my view of him and as I saw him I immediately stopped.  He looked up at me and I told him I needed the truck and would bring it right back.  When I was finished cleaning the

034-09's I did not see Dave in the area to help me so I went to get a half cage of red tagged parts myself.

(Filing 19-2, Ex. 5 at CM/ECF page 7.)

23.    In her deposition, Golter acknowledged that Dave Cooper's job was to use a hand truck to move parts, but indicated that she thought Cooper should have used a different hand truck and she wanted to use the truck she took from Cooper, rather than another available truck.  (Filing 19-2, Ex. 1 (Golter Dep.) at 83:4-21.)

24.    On September 21, 2004, Judy Osmera was working in the same area of the Square D plant as Golter.  Osmera observed that Golter had (1) put up a different parts cage on a different machine, contrary to instructions; (2) took the toll gate from Osmera's machine to the press area; (3) left her work area and took a hand truck from Dave Cooper; and (4) left her work area for a length of time, causing parts to fall off the belt and onto the floor.  Osmera reported this activity to a supervisor, Trish Seidel. (Filing 19-2, Ex. 4 (Osmera Aff.) at CM/ECF pages 4-5.)

25.    Following an investigation and interview of employees involved, Golter's employment was terminated on September 22, 2004 for failure to comply with her Last Chance Agreement.  (Filing 19-2, Ex. 4 (Osmera Aff.) at ¶ 3 and CM/ECF page 4; Filing 19-2, Ex. 8 (notes of Trish Seidel) at CM/ECF pages 14-18; and Filing 19-2, Ex. 13 (Termination Notice) at CM/ECF page 28.)

26.    The union grieved Golter's termination.  The union determined not to arbitrate the termination, and Golter's job was not reinstated.  (Filing 32, Ex. 16 (Golter Dep.) at 118:13-119:1.)

23.     Golter cannot identify any employee, whether male or female, with the same disciplinary record who was treated more favorably.  (Filing 19, Ex. 1 (Golter Dep.) at 102:3-103:13.)

27.     Dave Cooper received five personnel memos and three training memos from December 10, 1995 to May, 2007, and had no written warnings or final reprimands.  (Filing 19-2, Ex. 6 (Valdez Aff.) at ¶ 9.)

28.     Only one other employee was offered a last chance agreement in the twelve months preceding Golter's termination.  Bob Buskirk, a 47-year old male, was offered a last chance agreement for failing to follow company attendance and leave of absence policies, and was terminated on October 15, 2004 when he refused to sign the agreement. (Filing 19-2, Ex. 6 (Valdez Aff.) at ¶ 12.)

29.     In 2005, Square D terminated Dave Bennett (male, 35) for creating a hostile work environment and terminated Beverly Taylor (female, 62) for misconduct. Neither were offered a last chance agreement prior to their discharges.  (Filing 19-2, Ex. 6 (Valdez Aff.) at ¶¶ 13-15.)

30.     Numerous employees at Square D older than Golter who are eligible for retirement benefits have retained their employment.  (Filing 19-2, Ex. 7.)

## II.  ANALYSIS

The general grounds for granting and denying a motion for summary judgment are well known.  I do not repeat them.  Rather, I give the specific reasons for my decision to grant the motion for summary judgment.

I first consider Plaintiff's age discrimination claim.  I then consider her gender or sex discrimination claim.  I do not separately consider the collateral state claims

brought under the Nebraska Fair Employment Practice Act (NFEPA) and the Nebraska Act Prohibiting Unjust Discrimination in Employment Because of Age, because Title VII and ADEA standards apply to interpretation of these state laws. *See, e.g., Father Flanagan's Boys' Home v. Agnew*, 590 N.W.2d 688, 693 (Neb. 1999) (gender discrimination provisions in NFEPA are patterned after Title VII and Nebraska courts look to federal decisions interpreting Title VII when interpreting NFEPA); *Billingsley v. BFM Liquor Mgmt., Inc.*, 645 N.W.2d 791, 801 (Neb. 2002) (when applying the provisions of the Nebraska age discrimination act, the Nebraska Supreme Court will look to federal decisions interpreting the ADEA).

## A.  Age Discrimination

It is clear that Plaintiff's age claim is a disparate *impact* claim and not a disparate *treatment* claim.  (Complaint ¶ 17; Filing 26 (Pl.'s Br. in Opp'n. to Mot. for Summ. J.) at 1.)  A disparate impact claim challenges a facially neutral employment practice that in fact falls more harshly on one group than another.  *Lewis v. Aerospace Comm. Credit Union*, 114 F.3d 745, 750 (8th Cir. 1997) (granting summary judgment on ADEA disparate impact claims) (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993)).  To recover on a disparate impact age claim, the plaintiff must identify a "facially neutral employment practice," demonstrate a disparate impact upon workers at least forty years of age, and prove causation.  *Id.* (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988)); 29 U.S.C. § 631(a).  To establish a prima facie case, the plaintiff "'must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applications for jobs or promotions [or other adverse impact on individuals] because of their membership in a protected group.'"  *Id.* (quoting *Watson*, 487 U.S. at 994).

-14-

*The Neutral Plan or Practice*

In her brief opposing summary judgment, Plaintiff identifies the facially neutral employment practice at the core of her age claim as follows: "Square D had a plan to hire workers at a lower tier with fewer benefits" and that this "two tier compensation system came into being approximately one year after Ms. Golter was terminated but had been talked about and discussed for a substantial period of time before that." (Filing 26, Pl.'s Br. in Opp'n. to Mot. for Summ. J. at 6.) Plaintiff asserts that although the plan "purports to replace higher seniority workers with lower seniority [workers] through what appears to be some type of attrition [,] . . . the plan also has an impact on higher seniority workers in that if they can be displaced through personnel actions, severance or early retirement, they [presumably Square D management] can get to the heart of the plan much more quickly. (*Id.*)

Plaintiff alleges that this unlawful "plan" is evidenced by paragraphs 26 -29 of Sue Larsen's affidavit (filing 27-2) and Plaintiff's Exhibit 3. (Filing 26, Pl.'s Br. in Opp'n. to Mot. for Summ. J. at 6.) Plaintiff's Exhibit 3 is a portion of the contract between Square D and the Union effective September 12, 2005. (Filing 27-5, at CM/ECF pages 1-4.) For purposes of this motion, and because it is clear that I must grant summary judgment on the age claim because Plaintiff has no statistical evidence to support it, I assume that the portion of Larsen's affidavit establishing the facially neutral plan and Plaintiff's Exhibit 3 are admissible and sufficient to establish that there was "a plan to hire workers at a lower tier with fewer benefits," that workers hired after August 1, 2005 would comprise the lower tier, and that termination of Plaintiff was a component of the "plan" because for some unspecified reason a certain number of senior workers had to be terminated before the two-tiered pay scale could be implemented. Though highly questionable, I assume for the purposes of this motion that this "plan" is not a generalized policy but rather the type of specific employment practice creating an adverse impact that is required to establish a prima facie case. *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) (rejecting adverse

impact age claim because assertion that pay plan was "relatively less generous to older workers than to younger workers" was merely a "generalized policy", and not a "specific test, requirement, or practice within the pay plan that has an adverse impact on older workers").

*Absence of Statistical Evidence*

Plaintiff has failed to present any statistical evidence on her adverse impact claim.  Her brief does not address the need for or absence of statistical evidence, and her index of evidence includes no statistical evidence.  (Filing 26 (Pl.'s Br. in Opp'n. to Mot. for Summ. J.); Filing 27 (Pl.'s Index of Evid.).)  Indeed, Plaintiff has not produced *any* evidence regarding the age of workers terminated to facilitate implementation of the two-tier pay plan.  To establish a prima facie case, the plaintiff "'must offer statistical evidence'" of adverse impact upon older workers because of their membership in a protected group.  *Lewis*, 114 F.3d at 750 (quoting *Watson*, 487 U.S. at 994).  Accordingly, Plaintiff has failed to establish a prima facie case of disparate impact age discrimination.

## B.  Gender or Sex Discrimination

When a plaintiff alleges sex or gender discrimination but has no direct evidence of discrimination, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies.  The plaintiff must establish a prima facie case, and this burden is "'not onerous.'"  *McGinnis v. Union Pacific R.R.*, 496 F.3d 868, 873 (8th Cir. 2007) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).)  If a prima facie case is established, there is a presumption of discrimination which requires the defendant to produce evidence of a legitimate, nondiscriminatory reason for the actions.  If such a reason is articulated, the plaintiff must show that this proffered reason is pretextual.  *Id.*

-16-

To establish a prima facie case, Golter must show that she (1) is within a protected class, (2) was qualified to perform her job, that is, that she possessed the basic skills necessary for performance of her job, (3) suffered an adverse employment action, and (4) has facts that give rise to an inference of discrimination. *Id.* at 874. In a gender discrimination case, a female plaintiff often attempts to satisfy the fourth element by showing that she was treated differently from similarly situated males. *Wells v. SCI Management, L.P.*, 469 F.3d 697, 701 (8th Cir. 2006).

Golter has established a prima facie case. Square D determined that Golter violated her last chance agreement on September 21, 2004, when she left her work area for a length of time and engaged in a dispute with coworker Dave Cooper as she took a hand truck from him. Golter asserts that she was treated differently and more harshly than Dave Cooper. She was terminated. He was not. I assume for purposes of this motion that these facts permit an inference of discrimination.

Square D has articulated a legitimate, nondiscriminatory reason for Golter's discharge. Golter had a series of disciplinary items in her file, had been given a last chance agreement, and violated that "last chance" on September 21, 2004. The last chance agreement specifically told Golter "[n]ot to get involved in matters that do not pertain to me. *Including, but not limited to, what machines co-workers are running or what they are doing*." (Filing 19-2, Ex. 2 at CM/ECF page 1 (emphasis added).) In Golter's letter to the NEOC, she admitted that she left her work area and took a hand truck from Dave Cooper. (Filing 19-2, Ex. 5 at CM/ECF page 7.) In her deposition, Golter acknowledged that Dave Cooper's job was to use a hand truck to move parts, but indicated that she thought Cooper should have used a different hand truck and she wanted to use the truck she took from Cooper. (Filing 19-2, Ex. 1 (Golter Dep.) at 83:4-21.) Coworker Judy Osmera clarifies that in order to take the hand truck from Cooper, Golter left her own work area while her machine was running, resulting in parts falling off that machine and onto the floor. (Filing 19-2,

Ex. 4 (Osmera Aff.) at CM/ECF pages 4-5.)  Thus the conduct Golter admits clearly was the type of interfering conduct prohibited by the last chance agreement.

Golter must establish a material question of fact as to whether the proffered reason for her termination–violation of the last chance agreement–was pretext for sex or gender discrimination.  She has not.

Golter asserts that her termination was improper because Square D failed to establish that it was for just cause.  (Filing 26, Pl.'s Br. in Opp'n. to Mot. for Summ. J., at 4.)  She offers the affidavit of union officer Sue Larsen and a checklist for just cause discharge used by the union.  Golter ignores the fact that this is a sex discrimination claim and not a just cause claim.  Even if I assume that Golter has established that her termination was not for just cause, this does not establish that termination for violation of the last chance agreement was pretext for sex discrimination.  At most, it indicates that the union may have breached its duty of fair representation by failing to arbitrate Golter's termination.

Golter attempts to create an issue of fact by asserting that her disciplinary history was insufficient to justify imposition of the last chance agreement.  (Filing 26, Pl.'s Br. in Opp'n, at 3 ("Defendant posits in its brief that Ms. Golter was the recipient of twenty[-]three disciplinary actions.  This assertion could not be farther from the truth.").)  She offers her own affidavit created in response to the summary judgment motion to support this assertion.

At her deposition, Golter was presented with a two-page document captioned "Golter Disciplinary History" which lists disciplinary items in her personnel file.[8]

---

[8]Although there are twenty-four entries on the list, one of those items is not disciplinary–acknowledgment of receipt of the workplace violence policy. Filing 19-2, Ex. 3 and CM/ECF pages 2-3.)

This two-page document was prepared by Square D's attorney and summarized documents which Square D's attorney had given to Golter's attorney prior to the deposition.  (Filing 32, Ex. 16 (Golter Dep.) at 84:20-22.)  The first listed item is "4-3-96 reprimand for employee conflicts."  (Filing 19-2, Ex. 3 and CM/ECF page 2.)

Golter was asked at her deposition whether the Disciplinary History document was an accurate description of the discipline she received in the last nine years of employment, and she answered evasively, indicating that she disagreed with some of the items.  (Filing 32, Ex. 16 (Golter Dep.) at 84:20-86:9.)  Square D's counsel handed her a reprimand dated April 3, 1996.  Golter acknowledged that the document was a reprimand, stated that it had been given to her previously, and agreed that it was about employee conflicts.  (Filing 32, Ex. 16 (Golter Dep.) at 86:14-20.)  Golter was then asked a second time if the Disciplinary History was "a correct reflection of the disciplinary history [she] received."  (Filing 32, Ex. 16 (Golter Dep.) at 87:5-7.)  When she responded by stating "[s]hould I just say yes?," Square D's counsel stated "if it isn't [correct], I can show you every one of them." (Filing 32, Ex. 16 (Golter Dep.) at 87: 8-10.)  At that point, Golter's attorney held an off the record discussion with her.  (Filing 32, Ex. 16 (Golter Dep.) at 11-14.)  This exchange immediately followed:

> Q.   [by Square D. counsel] Ms. Golter, after you've had a chance to confer with your counsel, I would ask you again, is Exhibit 16 [the two-page Disciplinary History] an accurate reflection of the discipline you received at Square D in the last nine year of your employment?
>
> A.   Yes.

(Filing 32, Ex. 16 (Golter Dep.) at 87:15-20.)

Despite explicitly stating at her deposition that the Disciplinary History listing twenty-three disciplinary actions from April 3, 1996 to her termination was "an accurate reflection of the discipline [she] received," and her explicit acknowledgment that she had previously been given the first action listed in that history, Golter's affidavit asserts that when she was shown the two-page Disciplinary History at her deposition, "without looking at the individual documents, I agreed at the time that it was a list of my disciplinary history." (Filing 27-9, Ex. 7 (Golter Aff.) ¶ 5.) Golter's affidavit further asserts that "[s]ince that time, I have had a chance to review the documents, and I have determined that several of them are not what they purported to be." (Filing 27-9, Ex. 7 (Golter Aff.) ¶ 6.)[9]

To the extent Golter's affidavit states that she did not have twenty-three disciplinary actions and that she had never been given a reprimand for employee conflicts dated April 3, 1996[10], I find that it is a sham attempt to contradict her deposition testimony. *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365-66 (8th Cir. 1983) (a party cannot create a "sham" issue of fact in an effort to defeat summary judgment by filing an affidavit directly contradicting prior deposition testimony; a district court should carefully articulate its reasons for finding an affidavit contradicts prior deposition testimony).

_____

[9]Golter's brief is nearly incoherent on this point. It appears to state that the personnel memos (there were fourteen) were not disciplinary actions because they were placed in her file without her knowledge, were not signed by her, and she had not been represented by a union official in connection with them. (Filing 26 at 3.)

[10]Golter asserts that the first action listed in the Disciplinary History, an April 3, 1996 reprimand for employee conflicts, was mistakenly in her file because it does not bear her identification number. Even if there were admissible evidence to support this assertion, it does not change the fact that she was the subject of twenty-two other disciplinary actions and violated her last chance agreement.

Golter asserted that Doug Meyers, Dave Kunz, Hoa Tran, Jeff Wheatley, Dave Cooper, and Steve Armbruster were similarly situated males who were not issued Last Chance Agreements although they alleged committed more serious violations of Square D policy. (Complaint ¶ 14; Filing 19-2, Ex. 14 (answer to interrogatory requesting identification of employees referred to in paragraph 14 of Complaint) at CM/ECF page s 29-30.) Golter has failed to produce evidence that these individuals were similarly situated, and produced no evidence of the alleged serious violations these men committed.

Dave Cooper was involved in the incident in which Golter violated her last chance agreement. Golter asserts that Cooper's actions in that incident should have led to disciplinary action against him. Although they may have had the same supervisor, Cooper is not similarly situated to Golter. Golter was a process operator with twenty-three disciplinary actions, which included a final reprimand, a three day suspension, referral to the employee assistance program, and a last chance agreement. Cooper was a setup man and had received no written warnings, no final reprimand, and no last chance agreement (he had received five personnel memos and three training memos). *Wells,* 469 F.3d at 701-02 (lower number of customer complaints received by comparators and fact that alleged comparators held different job within the company indicate comparators were not similarly situated).

Lastly, I have carefully reviewed the affidavits and other authenticated exhibits offered by Plaintiff to see if there is anything else that would preclude summary judgment. (Filing 27, Ex.'s 1-7.) It would serve no purpose to detail the reasons why that evidence does not create a question of fact as to whether Golter's termination for violation of the last chance agreement was a pretext for discrimination. In large part, that evidence is either irrelevant, not based on personal knowledge, hearsay, or otherwise inadmissible. Moreover, setting aside the conclusory statements which comprise the bulk of the affidavits, even if every admissible fact in those affidavits is true, Plaintiff has failed to identify a dispute of *material* fact.

-21-

For the foregoing reasons,

IT IS ORDERED that Defendant's motion for summary judgment (filing 17) is granted.  Judgment will be entered by separate document.

November 27, 2007.                       BY THE COURT:

                                         *s/Richard G. Kopf*
                                         United States District Judge